Wardens of Christ Church *v.* Pope.

WARDENS OF CHRIST CHURCH *vs.* GEORGE W. POPE.

The vote of a religious society, assembled at its annual meeting for the election of officers, that the officers shall be always chosen by ballot, does not invalidate an election of officers by hand vote at a subsequent annual meeting.

The election, by hand vote, of officers of a religious society, in which each proprietor has a vote for every pew which he owns, cannot be objected to, upon the ground of the inherent difficulty of thus ascertaining the result, after the election has taken place and the result has been declared.

The vote of a Protestant Episcopal Church to increase the number of vestrymen does not affect the rights and powers of the former vestrymen, until the additional members have been chosen.

A warrant of the vestry of a Protestant Episcopal Church, calling a meeting of the proprietors to elect officers, may be signed by the chairman and clerk only.

The vestry of a Protestant Episcopal Church have authority to call meetings of the proprietors.

The vestry of a Protestant Episcopal Church may transact business in the absence of both wardens, if a majority of all their members is present; even if it has been voted at several annual meetings, "that one warden and four vestrymen constitute a quorum for transacting business."

The reception of illegal votes at the election of officers of a religious society does not invalidate the election, if it does not affect the result.

Wardens of Christ Church *v.* Pope.

ACTION OF CONTRACT, commenced on the 19th of February 1855, by " The Wardens of Christ Church in Salem Street in Boston, the individual members whereof are Elias W. Goddard and William P. Parrott, a corporation duly established by law," to recover one quarter's rent, due December 15th 1854, of land in Chambers Street in Boston, under a lease from the plaintiffs, as such wardens, to the defendant. Answer, payment of said rent to William W. Mair and Edwin H. Sampson, legal wardens of said church.

Goddard and Parrott had been duly elected at the Easter meeting in 1853 wardens of the church for the ensuing year, and claimed to have been reëlected wardens in September 1854; but the defendant contended that Mair and Sampson were elected wardens in that month; and the question whether, at the commencement of this suit, Goddard and Pope were the wardens of Christ Church, and entitled to recover the rent demanded, was submitted to the decision of the court upon a statement of facts, so much of which as is material to the understanding of the opinion is stated therein.

*J. A. Andrew & J. H. Wakefield,* for the plaintiffs.

*G. M. Browne,* for the defendant.

DEWEY, J.* This is an action to recover of the defendant a certain sum of money alleged to be due from him to the wardens of Christ Church for a quarter's rent of certain premises held under a lease from them. The defence to the action involves the question of the validity of various proceedings of members of this religious society in the election of their annual officers in the year 1854, and more particularly who were the legal wardens of this society on the 15th of December 1854.

In deciding the present case, we shall assume, what seems to be conceded by both parties, that for some cause an occasion existed for resorting to the provisions of the Rev. Sts. c. 20, § 26 & seq., for calling a meeting of the members of a religious society through the agency of a justice of the peace, upon the application of five members of the society, and that the meeting of

---

* METCALF, J. did not sit in this case.

May 24th 1854, called by Mr. Wakefield as a justice of the peace, was legally called. What seems to put the question beyond any further inquiry, is the fact that these plaintiffs, then holding the office of wardens, were a portion of those members who united in the application to Mr. Wakefield to call that meeting, and also that at the annual meeting previously called by the vestry it was voted to continue the business incident to the Easter meeting, under the organization to be had under the new call. It appears therefore that all parties to the present controversy united in the meeting of May 24th 1854, and recognized it as a legal meeting.

The meeting of the 24th of May was continued by adjournment to the 8th of June, when it was voted to " proceed to the election of vestrymen, and that the vestry consist of eleven in number, including the rector and wardens ; " and the meeting then proceeded to elect by hand vote the eight vestrymen. No objection exists to the legality of the election of the eight vestrymen, except that they were elected by a hand vote. This is supposed to be illegal, because contrary to the rule of this religious society, meeting as the congregation of Christ Church, on the 6th of April 1724, when it was voted " that the church wardens and vestry be always chosen by a written vote; " and also for the further reason that the right to vote depended upon the ownership of pews, and a proprietor of pews was entitled to one vote for each pew he held.

As to the first of these objections, it is to be remarked that this was not the ordinary case of the corporate body making rules and by-laws for the government of their agents; but the vote of 1724 was that of a body assembled at their annual meeting for the choice of officers, and having no power over the election of officers at the next succeeding annual meeting. We are of opinion that such a vote could not have any binding efficacy upon those subsequently assembled to perform the like duties, and that such future body would have an equal right to determine the mode of electing the officers for the year ensuing, as their predecessors had.

The greater objection to this election is, we think, that aris-

ing from the inherent difficulty of voting by hand vote, where the individuals voting have more than one vote, as they might have in the present case. The more convenient way certainly would be to adopt the more usual practice of voting by written votes, and designating on each ballot the name of the voter and the number of votes he was entitled to give. The result might however be ascertained by hand vote, not by counting the hands merely, but by allowing to each hand raised the number of votes the person was entitled to. And we think this mode of election cannot be objected to, after the voting has actually taken place and the result been ascertained; and that it was not enough, after the election, for an individual member to give notice that he should at a future time move a reconsideration of the vote as to the manner of electing vestrymen, nor by filing a protest against such election at a subsequent meeting. There is nothing to show that the eight persons then declared to be elected did not receive a majority of all the votes of the voters present, computing the individuals who voted as entitled to all the votes for pews they represented. The objection should be taken earlier, or it is waived. We are therefore of opinion that the eight vestrymen, then declared elected, were legally elected and competent to discharge the duties of that office.

The next inquiry is as to the effect of the doings of the meeting of June 29th 1854, held by adjournment from the 8th of June. At this adjourned meeting of the proprietors, it was voted, apparently unanimously, " that the vestry be increased to a number not exceeding fifteen, and that eleven shall be a competent quorum." No further proceedings took place as to electing the four additional vestrymen; but the meeting was further adjourned to the 3d of August 1854, and again to the 11th of September, and from thence to the 18th of September. It is objected on the part of the plaintiffs, that after the votes above referred to, increasing the number of vestrymen, and making eleven a quorum, the eight vestrymen who had been previously chosen on the 8th of June could not act as a legal body, and especially could not act unless the whole eleven, including the rector and wardens, were present.

In the opinion of the court, the vote of June 29th on this subject did not affect the rights of the eight vestrymen, previously elected, to transact business and discharge the duties of vestrymen, the other four not having been elected.

The next inquiry is as to the validity of the proceedings of these vestrymen, who, in connection with the rector, on the 29th of August called a meeting of the proprietors, to be held on the 7th of September, to choose wardens, and for other purposes. If the vote of the persons acting as a vestry was a legal act, we perceive no objection to the form of the notice, it being under the hands of the chairman and clerk of that meeting. It was not necessary that it should be under the hands of the members of the vestry individually — that not being required by any statute, nor by law applicable to such cases.

As to the authority of the vestry to call a meeting of the proprietors, it does not seem to be specially provided for; but, considering the nature of the duties devolving upon the vestry, we think, in the absence of any provision repugnant to such powers, it may be considered as falling within their legitimate authority to call meetings of the proprietors. Looking at the former practice of this particular society, it would seem to be more formal and authoritative than the usual mode in which such meetings have been called.

The strongest objection, in our view, to the validity of the calling of this meeting of September 9th is that to the authority of a vestry to act, in the absence of both the wardens. Upon this subject, we have not been furnished with any authority, establishing, as a general rule, the necessity of one of the wardens being present, to constitute a legal board of the vestry. The subject seems to be left without any direct authority upon this point. In many of the other states there has been special legislation as to the organization and management of the ordinary concerns of the Episcopal Churches, whereas in Massachusetts we have no such legislation at all applicable to the matter we are considering. In the absence of such special legislation, we would seek light from the most approved treatises upon the law of the Episcopal Church; but they do not, so far as we have

been referred to them, meet this point. The vestry, it will be seen, consists of the wardens and the vestrymen, and the rector, as it may be, and is in the present instance. When thus assembled, they compose one body, and the majority decide, irrespectively of the concurrence of the wardens. It may be therefore, that whatever other independent powers they possess, yet when acting in this particular relation, and when considered as a component part of the vestry, they have only the same powers or votes as any other members of the vestry. In the absence of authority to the contrary, we assume therefore, that as component parts of the whole body, the rule applicable to other corporations would apply to them, and that the vestry would be represented by a quorum competent to act whenever a majority of the whole number of those composing the vestry were present.

This would be decisive of the authority of the vestry to act in calling the meeting of September 7th, unless the general rule that a majority will constitute a quorum, is qualified by a vote of the proprietors of Christ Church, passed on the 30th of April 1838, when it was voted " that one warden and four vestrymen constitute a quorum for the transaction of business." A similar vote was passed on the 4th of May 1840, and on the margin of the records of May 2d 1842, it is said, " one warden and four vestrymen constitute a quorum for the transaction of business."

The inquiry naturally presents itself whether these were votes intended to restrict the vestry from acting when a majority was present, and a quorum merely constituted; or an enabling vote, having reference to a large vestry, and for the purpose of authorizing action when less than a majority of the whole were present. The number required by this vote to be present was in fact less than a majority, and it may have been deemed expedient, when giving power to a minority to act, to provide that there should be present one of the wardens.

Another question also presents itself, whether the votes were intended as annual votes, applicable to the particular year in which they were passed, or as permanent in their application The fact of their being repeatedly adopted would rather lead to

the inference that they were considered as limited votes, and not permanent ones, affecting the period beyond the year in which they were adopted. Without feeling that entire confidence in the correctness of the result to which we have arrived on this point, which we should desire, our opinion is, that these votes were not intended to restrain the vestry from acting when a majority of all its members were present; but were enabling votes, by which a minority might act, provided one warden and four vestrymen were present. Had it been otherwise, we should not expect any provision with regard to vestrymen, but a vote simply declaring that in all cases, to constitute a quorum of the vestry, one warden must be present.

We are therefore of opinion that a majority of the members composing the vestry being present, although no warden was present, a competent quorum was assembled, and they might properly call the meeting of the 7th of September.

This meeting having been thus legally called, they properly proceeded to elect William W. Mair and Edwin H. Sampson as wardens.

Some objection was suggested to the legality of the election of those persons, upon the ground that illegal votes were received. But there is nothing in the case to show that they affected the result, or that a majority of votes were not cast for those persons, without counting such supposed illegal votes.

The wardens thus chosen succeeded to the offices held by Goddard and Parrott, and assuming that these latter persons legally held over, and continued to be the legal wardens until others were chosen in their stead, yet when others were chosen, they ceased to be wardens. Thus the office of warden being filled for the remainder of the parochial year, there was no authority for the meeting holden on the 18th of September, under the warrant from Henry M. Parker, to proceed to the choice of wardens, nor can the plaintiffs have any legal rights, as wardens, under that election. After the 7th of September, the plaintiffs ceased therefore to be legal wardens, and Mair and Sampson succeeded to their offices. After this, the latter were properly regarded as holding such offices, and the defendant might deal

with them as such, and a payment made to them as wardens of Christ Church would be duly made.

The plaintiffs have therefore failed to maintain their action, and judgment must be entered for the defendant.